IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terrance Williams; Richard : 
Laird; Robert Wharton; Hubert : 
Michael,  Michael E. Ballard, : 
individually and on behalf of : 
all others similarly situated, : 
          Petitioners : 
       : 
        v. : 
       : 
Commonwealth of Pennsylvania : 
Department of Corrections, :   No. 353 M.D. 2014
        Respondent :   Argued:  March 11, 2015

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
              HONORABLE BERNARD L. McGINLEY, Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE MARY HANNAH LEAVITT, Judge
              HONORABLE P. KEVIN BROBSON, Judgeh
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McGINLEY           FILED:  October 15, 2015

      Presently before this Court are the Department of Corrections' (DOC)

Preliminary Objections (POs) to a Second Amended Class Action Petition for

Review in the Nature of a Complaint in Equity (Petition).[1]  Petitioners bring this

---

[1] Five inmates sentenced to death in Pennsylvania (Petitioners) initially filed a petition on July 3, 2014, and named Terrence Williams, Richard Laird and Robert Wharton as bringing claims on behalf of themselves and as class representatives.  The DOC filed POs on August 11, 2014, and Petitioners filed an amended petition on the same day adding Hubert Michael as a fourth Petitioner.
      The DOC preliminarily objected to the amended petition.
      On September 29, 2014, Petitioners filed POs to the DOC's POs and alleged that the DOC's POs lacked specificity and that the DOC's challenge to Petitioners' class-action status

**(Footnote continued on next page…)**

action on behalf of themselves and a class of all 184 inmates sentenced to death in the Commonwealth.

## I. Brief History.

In 1990, the General Assembly adopted the following method of execution: "[t]he death penalty shall be inflicted by injecting the convict with a continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with chemical paralytic agents approved by the department until death is pronounced by the coroner." 61 Pa. C.S. § 4304(a)(1); Amended Petition ¶ 23 at 8.

The DOC first promulgated the lethal injection execution protocol (Protocol) to implement the statute in April of 1991 and revised the procedures on multiple occasions, most recently in 2012.[2]

_____

**(continued…)**

was improperly raised because it was not raised in new matter rather than by preliminary objection.

On October 21, 2014, this Court sustained Petitioners' POs with regard to the specificity of the DOC's demurrers and to the class action and denied the POs in all other regards.

The DOC filed the present amended POs on November 7, 2014. Petitioners filed a second amended petition for review on November 12, 2014, and added Michael E. Ballard as a fifth Petitioner, but alleged identical claims as in the original petition. The DOC consented to this amendment and this Court issued an Order on November 14, 2014, granting the addition.

[2] The Capital Case Procedures Manual directs:

**B. Pre-Execution Procedures**

….

2. Lethal Injection Team (LIT)

a. The Department [DOC] will obtain the services of a sufficient number of individuals qualified to administer the lethal injection to ensure that a two-

**(Footnote continued on next page…)**

**(continued…)**

member team, at a minimum, will be available for each scheduled execution….

….

d. All LIT members must be trained health care professionals who have completed intravenous therapy training and are experienced in performing venipuncture….

….

3. Commencement of the Lethal Injection

….

c. When the signal is given to start the execution, the LIT will follow this sequence:

(1) If pentobarbital is being used:

(a) one syringe containing 2,500 mg pentobarbital…will be inserted in the…tube of the left arm IV administration set and the injection shall commence. The emptied syringe will be removed from the injection tube; and

(b) a second syringe containing 2,500 mg pentobarbital…will be inserted into the…tube of the right arm IV administration set and the contents injected. The emptied syringe will then be removed from the injection tube.

(c) 50ml Normal Saline…will be inserted into the… the left arm IV administration set and the contents injected to flush the line.

(2) If thiopental is being used:

(a) A syringe containing 1.5 gm thiopental…will be inserted…in the left arm IV administration set and the injection shall commence. The emptied syringe will be removed from the injection tube.

(b) A second syringe containing 1.5 gm thiopental…will be inserted into the…left arm IV administration set and the contents injected. The emptied syringe will then be removed from the injection tube.

(c) 50 ml Normal Saline…will be inserted into the…left arm IV administration set and the contents injected to flush the line.

**(Footnote continued on next page…)**

## II. Petitioners' Amended Petition.

Petitioners seek declaratory and injunctive relief. Petitioners request this Court to declare the DOC's Protocol invalid and unlawful.

> 5. Pennsylvania prescribes that the death penalty shall be inflicted by injecting the condemned inmate with a lethal combination of two types of drugs- 'an ultrashort-acting barbiturate' and 'chemical paralytic agents.' 61 Pa.C.S.A. [sic] § 4304(a)(1).

---

**(continued…)**

> ….
> (3) Following administration of the second syringe of pentobarbital or the second syringe of thiopental and the Normal Saline:
>
> ….
> (4) One dose of 50 mg of pancuronium bromide, will be administered through…the left arm IV administration set.
> (5) Upon completion of the first dose of 50mg pancuronium bromide, a second dose of 50 mg pancuronium bromide will be administered through…the left arm IV administration set.
> (6) The…left arm IV administration set will then be flushed with 50 ML Normal saline.
> (7) A syringe containing 50 meq [milliequivalent] potassium chloride…will be inserted into…the left arm IV administration set and the entire contents shall be injected.
> (8) When the contents of the first potassium chloride syringe have been injected, the emptied syringe will be removed and a second syringe containing 50 meq potassium chloride…will be inserted in to…the left arm IV extension set and injected. The emptied syringe will then be removed.
> ….

Commonwealth of Pennsylvania, Department of Corrections' Procedures Manual, August 27, 2012, at 3-27.

6. The General Assembly adopted this method of execution in 1990, after extensive fact-finding, testimony, and public debate.

7. In April 1991, the DOC promulgated Pennsylvania's first lethal injection procedures to implement [61 Pa.C.S.] § 4304. The DOC has revised and adopted new procedures on multiple occasions, and in 2012, the DOC adopted the current execution protocol….

8. Contrary to the statute, the protocol dictates that lethal injections will be administered with *three* different types of drugs. The first drug, pentobarbital, and the third drug potassium chloride, do not fall under either drug type authorized by the legislature. Further, the protocol fails to use 'an ultrashort-acting barbiturate,' as required by statute.

9. The current protocol exceeds the statutory grant, conflicts with the express terms of the statute, and is inconsistent with the purpose of the statute, which was to adopt the most 'humane' method of execution. The DOC's selection of lethal injection drugs outside the statutory grant undermines the Legislature's decision to reserve for itself the selection of the types of drugs that will be used in executions.

10. The DOC adopted the execution protocol in secret, without public notice, hearing, or comment. The DOC is required to follow a formal rule-making process when, as here, it promulgates new regulations or amends existing ones. See 45 P.S. §§ 1102, 1201-1208 (the Commonwealth Documents Law or 'CDL')[3]; 71 P.S. §§ 745.1-745.15 (the Regulatory Review Act or 'RRA')[4]; 71 P.S. §§ 732-101- 732-506 (the Commonwealth Attorneys Act or 'CAA')[5]. Because the DOC failed to

---

[3] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602, and 45 Pa.C.S. §§ 501-907, which, collectively, are known as the "Commonwealth Documents Law." This was the official short title of the 1968 enactment. *See* Section 101 of the Act of July 31, 1968, P.L. 769.

[4] Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-745.15.

[5] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732-101- 732-506.

follow these mandatory processes, the execution protocol is a nullity.

11. In addition, the protocol is unreasonable because it conflicts with other provisions of state and federal law, including restrictions that prohibit pharmacies from providing controlled substances without valid medical prescriptions, restrictions that prohibit pharmacies from selling certain compounded drugs, and restrictions that prohibit registered nurses and paramedics from administering the lethal drugs or otherwise participating in executions.

….

27. Pentobarbital is neither <u>an ultrashort-acting barbiturate nor a chemical paralytic agent</u>. Pancuronium bromide is a chemical paralytic agent. <u>Potassium chloride is neither an ultrashort-acting barbiturate nor a chemical paralytic agent</u>. (Emphasis added.)

28. The sections of the execution protocol relevant to this lawsuit consist of rules and regulations. The protocol was promulgated under the authority of a statute that DOC administers and which prescribes practices and procedures for the DOC.

29. The DOC is required to follow a formal rule-making process when it promulgates new rules and regulations or amends existing ones.

30. The DOC adopted and amended the execution protocol without public notice, hearing, or comment. In adopting and amending the protocol, the DOC did not follow the requirements of the CDL, 45 P.S. §§ 1102, 1201-1208, the RRA, 71 P.S. §§ 745.1-745.15, or the CAA, 71 P.S. §§ 732-101- 732-506.

31. Under the protocol, DOC obtains lethal injection drugs, including compounded drugs, from one or more pharmacies. The protocol is unreasonable because, under the federal Food, Drug, and Cosmetic Act (FDCA), DOC is prohibited from obtaining, and pharmacies are prohibited from providing, a compounded copy of an FDA-approved drug, like pentobarbital, through

6

interstate commerce. See 21 U.S.C. §§ 502-505, 582; see also 21 U.S.C. §§ 331, 355.

32. Under the protocol, DOC obtains lethal injection drugs without a valid medical prescription. The protocol is unreasonable because, under the federal Controlled Substances Act (CSA)[6] and the Pennsylvania Pharmacy Act[7], DOC is prohibited from obtaining, and pharmacies are prohibited from providing, lethal injection drugs without a valid medical prescription. See 21 U.S.C. [§§ 801-971]; 63 P.S. [§§ 390-1- 390-13].

33. The DOC utilizes a 'Lethal Injection Team' (LIT) to administer an execution. The LIT's responsibilities include performing venipuncture and establishing intravenous lines in the condemned inmates, administering the lethal drugs, and participating in consciousness checks of the inmates.

34. …Current members of the LIT are registered nurses and/or certified paramedics.

35. Registered nurses may perform venipuncture only when it has been 'ordered in writing for the patient by a doctor of the healing arts.' 49 Pa. Code § 21.12(a). The execution protocol is unreasonable because it conflicts with this statutory prerequisite. (Emphasis added.)

36. Registered nurses may administer anesthesia only if certified as a Registered Nurse Anesthetist, and only under the direction of, or in consultation with, a physician. 49 Pa. Code. [sic] §21.17. The execution protocol is unreasonable because it conflicts with these statutory prerequisites. (Emphasis added.)

37. Direct or indirect participation in an execution is contrary to the ethical standards of the nursing profession. Willful violation of the nursing laws or of ethical standards may be punished by suspension or

---

[6] 21 U.S.C. §§ 801-971.

[7] Act of September 27, 1961, P.L. 1700, *as amended*, 63 P.S. §§ 390-1- 390-13.

revocation of the nursing license, criminal prosecution, and/or a civil fine. 63 P.S. [§] 223; 63 P.S. [§] 224(a). The execution protocol is unreasonable because it conflicts with these ethical and statutory provisions.

38. Paramedics may lawfully administer only certain drugs, and a paramedic may lawfully administer other drugs only when acting under the orders of a physician. *See* 28 Pa. Code. [sic] § 1005.11. <u>Absent a physician's order, paramedics may not lawfully administer sodium thiopental, pancuronium bromide, or potassium chloride</u>….(Emphasis added.)

39. Direct or indirect participation in an execution is contrary to the ethical standards of the paramedic profession. Paramedics who willfully or negligently practice beyond the scope of their authorization face disciplinary or corrective action. See 28 Pa. Code § 1003.27. The execution protocol is unreasonable because it conflicts with these ethical and statutory provisions.

### Exhaustion of Administrative Remedies

40. There is no administrative remedy available to Petitioners. DOC refuses to provide a copy of the execution protocol to death row inmates and, where an inmate files an administrative grievance as 'frivolous' and provides no administrative recourse.
….

### Claims for Relief

### <u>Claim 1</u>
The execution protocol adopted by the Department of Corrections exceeds and conflicts with the statutory authorization set forth in [Pa.C.S. 61] § 4304.[8]

### <u>Claim 2</u>
The execution protocol adopted by the Department of Corrections violates the requirements of the

---

[8] Claim I is based on the allegations raised in Petitioners' Amended Petition at paragraphs 8-9 and 27-28.

Commonwealth Documents Law, 45 P.S. §§ 1102, 1201-1208, the Regulatory Review Act, 71 P.S. §§ 745.1-745.15, and the Commonwealth Attorneys Act, 71 P.S. §§ 732-101 to 732-506. The execution protocol is also unreasonable in that it conflicts with ethics provisions and with state and federal law, including the federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 502-505, 582; the federal Controlled Substances Act, 21 U.S.C. §§ 802, 822, 829; the Pennsylvania Pharmacy Act, 63 P.S. [§§ 390-1- 390-13]; as well as 28 Pa. Code. § 1005.11, 41 Pa. B. 2286, 49 Pa. Code § 21.12, 49 Pa. Code. § 21.17, 63 P.S. 223, and 63 P.S. 224(a).

Petition, August 26, 2014, ¶¶ 5-11, 27-40 at 2-3 and 9-12.

### III. The DOC's Amended Preliminary Objections.

The DOC preliminarily objects to the Petition and asserts:

### I. <u>In the Nature of a Demurrer</u>:

1. Claim I…fails to state any claim for which relief may be granted.
….
4. <u>…[T]he execution protocol does not impermissibly conflict with the statutory provisions [of Section 4304 of the Prisons and Parole Code (Code), 61 Pa. C.S. § 4304(a)(1)] and therefore Claim I should be dismissed because it fails to allege sufficient facts to provide any relief to petitioners</u>. (Emphasis added.)

5. Claim II…fails to state a claim for which relief may be granted.
….
7. As a matter of law, this Court can review the provisions of the execution protocol adopted by the Department of Corrections and determine that it does not impermissibly conflict with the state and federal laws listed in the Amended Petitioner [sic] and therefore Claim II should be dismissed with prejudice.

9

**II. Lack of Jurisdiction.**

8. The [A]mended [P]etition presents no claim that is ripe for review.

9. Insofar as [P]etitioners' claims seek to have the Court determine that the DOC's lethal injection protocol conflicts with federal law, including the Food, Drug and Cosmetic Act ('FDCA'), 21 U.S.C. §§ 502-505 and 582, and the Controlled Substances Act ('CSA'), 21 U.S.C. §§ 802, 822 and 829, the Court lacks jurisdiction to hear and decide such issues.

10. Insofar as [P]etitioners' claims seek to have the Court determine that the participation of nurses and/or paramedics in effectuating capital punishment violates their respective professional ethical standards, the Court lacks jurisdiction to hear and decide such issues.

11. Insofar as [P]etitioners' claims seek to have the Court determine whether there has been compliance with the Pennsylvania Pharmacy Act ('PPA'), 63 P.S. §390-1 et seq., the Court lacks jurisdiction to hear and decide such issues.

**III. Lack of Standing/Capacity to Sue.**

12. None of the [P]etitioners have standing to challenge the legality of the DOC's execution procedures. (Emphasis added.)

13. Insofar as [P]etitioners seek to have the Court determine that the participation of nurses and/or paramedics in effectuating capital punishment violates their respective professional ethical standards, they lack standing to pursue such issues. (Emphasis added.)

14. Petitioners lack standing to pursue claims under the PPA, the Regulatory Review Act ('RRA'), 71 P.S. § 745.1 et seq., the Commonwealth Documents Law ('CDL'), 45 P.S. § 1101 et seq., or the Commonwealth Attorneys Act ('CAA'), 71 P.S. § 732-101 et seq.

10

15. Petitioners lack standing to pursue claims under either the FDCA or the CSA.

The DOC's POs, ¶¶ 1, 4, 5, 7-15 at 1-3.

## IV. Discussion.

### A. Whether Claim I Of The Petition States A Claim For Which Relief May Be Granted?

To begin, Petitioners allege that the procedures outlined in the Protocol are inconsistent with Section 4304(a)(1) of the Code, 61 Pa. C.S. § 4304(a)(1), for the following reasons: 1) the Protocol fails to require the use of an ultrashort-acting barbiturate as required by the statute; 2) the use of pentobarbital and potassium chloride violates legislative intent because the drugs are neither ultrashort-acting barbiturates nor chemical paralytic agents; and 3) the law only allows for two drugs to be administered while the Protocol provides the use of three drugs.

Section 4304(a)(1) of the Code provides that "[t]he death penalty shall be inflicted by injecting the convict with a continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with chemical paralytic agents approved by the department [DOC] until death is pronounced by the coroner." 61 Pa. C.S. § 4304(a)(1). This question of interpretation is one of first impression.

11

The DOC argues[9] that Petitioners fail to state a claim in Claim I for two reasons. First, the Protocol lists two options for the first drug injected into an inmate: pentobarbital or sodium thiopental. Sodium thiopental is an ultrashort-acting barbiturate and Petitioners do not allege otherwise. Second, nothing in the statute limits the DOC to using only ultrashort-acting barbiturates in combination with chemical paralytic agents.

The DOC explains that Petitioners' allegations fail to state a claim because "nothing in the plain language of the statute prohibits the [DOC] from using another drug or drugs in addition to an ultrashort-acting barbiturate and chemical paralytic agent…" The DOC's brief at 10. The DOC argues that nothing in the statute bars the DOC from using any other drug(s) as part of its execution procedures and therefore the Protocol does not violate state law.

---

[9] When ruling on preliminary objections in the nature of a demurrer, this Court will assume that the Petitioners' factual allegations are true. *May v. Kosinski*, 86 A.3d 945, 948 n.6 (Pa. Cmwlth. 2014). However, "the court need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion." *Penn Title Insurance Company v. Deshler*, 661 A.2d 481, 483 (Pa. Cmwlth. 1995). "A demurrer will not be sustained unless the face of the complaint shows that the law will not permit recovery, and any doubts should be resolved against sustaining the demurrer." *Id.* Therefore, this Court's inquiry is limited to whether it is certain, based on the facts alleged, that the DOC's Protocol is consistent with the statute and does not violate legislative intent.

As with all cases involving the interpretation of a statute, this Court is guided by the provisions of the Statutory Construction Act of 1972. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921. "Generally speaking, the best indication of legislative intent is the plain language of a statute." *Sternlicht v. Sternlicht*, 876 A.2d 904, 909 (Pa. 2005) (citations omitted). "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage." *Id.* (quoting 1 Pa. C.S. § 1903).

The term "ultrashort-acting barbiturate" in the statute is singular while the term "chemical paralytic agents" is plural. However, when interpreting specific phrases in statutes, "the singular shall include the plural, and the plural, the singular." 1 Pa. C.S. § 1903. Thus, it is possible to interpret this phrase as requiring the use of both ultrashort-acting barbiturates and chemical paralytic agents in all executions, and providing the DOC with the discretion to use more than one type of each drug as it deems necessary.

Under the maxim *expression unius est exclusion alterius*, "the express mention of a specific matter in a statute implies the exclusion of others not mentioned." *West Penn Allegheny Health Systems v. Medical Care Availability & Reduction of Error Fund*, 11 A.3d 598, 605-06 (Pa. Cmwlth. 2010). Applying this maxim means the failure to mention an additional type of drug after specifying two specific types of drugs, may imply exclusion of an additional type of drug. As with all cases involving the interpretation of a statute, we are guided by the provisions of the Statutory Construction Act of 1972. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921. "Generally speaking, the best indication of legislative intent is the plain language of a statute." *Sternlicht v. Sternlicht*, 876 A.2d 904, 909 (Pa. 2005) (citations omitted).

At this early stage of the litigation, taking Petitioners' allegation that pentobarbital and potassium chloride are neither ultrashort-acting barbiturates nor chemical paralytic agents as true, Petitioners have stated a claim that the Protocol violates the statute. Therefore, the DOC's first PO is overruled.

13

## B.  Whether The First Portion Of Claim II Of The Amended Petition States A Claim Upon Which Relief May Be Granted?

In their second claim Petitioners assert that the Protocol violates the requirements of the Documents Law, the Review Act, and the Attorneys Act.

The DOC argues that Petitioners fail to state a claim in Claim II for two reasons.  First, the Protocol is part of a DOC manual detailing internal operating procedures which is not subject to the requirements of the Documents Law, Review Act, and Attorneys Act.  The Protocol has no impact on the general public and, thus, the public need not participate in the establishment of the Protocol.  Given the unique prison environment, the DOC must have the right to enforce reasonable rules separate from formal regulations.  The DOC does not dispute that the Protocol was not promulgated in accordance with these statutes.  Essentially the DOC argues that the Protocol is not a regulation and, therefore, it is not required to follow formal rule-making procedures.[10]

This Court must determine, assuming the averments of Petitioners are true, whether under no circumstances may the Protocol be considered a regulation requiring formal rule-making procedures.

A regulation promulgated in violation of the requirements of the Documents Law, the Review Act, and the Attorneys Act will be declared a nullity. *Borough of Bedford v. Department of Environmental Protection*, 972 A.2d 53, 62 (Pa. Cmwlth. 2009).  Conversely, the DOC may issue "non-legislative rules" such

---

[10] The DOC also contends that in arguing that the Protocol is unreasonable, Petitioners failed to show that the Protocol violates any other state or federal law.

14

as statements of policy or interpretative rules that do not go through the normal rule-making process. *Northwestern Youth Services Inc. v. Department of Public Welfare*, 66 A.3d 301 (Pa. 2013).[11] Applying the "binding norm test" assists in determining whether a statement or rule was issued by an administrative agency. *Department of Environmental Resources v. Rushton Mining Company*, 591 A.2d 1168, 1173 (Pa. Cmwlth. 1991). Under the binding norm test, an agency decision is not a statement of policy if it is binding on the agency. *Id.* "To determine whether an agency has attempted to establish a binding norm without required procedure, courts consider the plain language of the enactment, the manner in which the agency implemented the provision and whether its discretion is restricted by the provision." *Cash America Net of Nevada, LLC v. Commonwealth*, 978 A.2d 1028, 1033 (Pa. Cmwlth. 2009). If the Protocol was designed to be a non-legislative rule, but, in effect, binds the DOC, the statement of policy or interpretive rule may function as a regulation for purposes of the Documents Law,

---

[11] In *Northwestern Youth Services*, the Supreme Court explained:

> Non-legislative rules…come in an abundance of formats with a diversity of names, including guidances, manuals, interpretative memoranda, staff instructions, policy statements, circulars, bulletins, advisories, press releases and others. When such documents fairly may be said to merely explain or offer specific and conforming content to existing statutes or regulations within the agency's purview, they are regarded as 'interpretative rules,' which generally are exempt from notice-and-comment rulemaking and regulatory-review requirements. Additionally, 'statements of policy'- or agency pronouncements which are not intended to bind the public and agency personnel, but rather, merely express an agency's tentative, future intentions- also are not regulations subject to notice-and-comment rulemaking and regulatory-review requirements.

*Northwestern Youth Services*, 66 A.3d at 310-12.

Review Act, and Attorneys Act and may only be deemed valid if it was promulgated through the normal rule promulgation procedure. *See Transportation Services Inc. v. Underground Storage Tank Indemnification Board*, 67 A.3d 142, 153 (Pa. Cmwlth. 2013) (stating "[i]f an interpretative rule or statement of policy functions as a regulation, then it will be nullified due to the agency's failure to obey the processes applicable to the promulgation of a regulation") (citations omitted).

In the present case, the Protocol is part of an internal operating manual and allegedly reflects the current procedures employed by the DOC personnel, as opposed to the DOC's "tentative future intentions." *Northwestern Youth Services Inc.* 66 A.3d at 311. The Protocol may bind the DOC personnel by the use of terms such as "must", "shall" or "will." Petitioners' brief notes that the word "will" appears 108 times in non-redacted portions of the Protocol and "shall" appears twenty-four times. Petitioners' Brief at 7, n.2. Conversely, the term "may" appears only four times and words "can" and "could" do not appear at all. Petitioners' Brief at 7, n.2.

In response, the DOC cites the Supreme Court's decision in *Small v. Horn*, 722 A.2d 664, 669 (Pa. 1998), for the proposition that it has the discretion to issue internal operating procedures without following the formal rule-making process. In *Small*, nine inmates challenged the DOC's issuance of bulletins which revoked the inmates' permission to wear civilian clothing. Our Supreme Court determined that the DOC's bulletins were not "regulations" for purposes of the Commonwealth Documents Law or the Regulatory Review Act, but instead

16

embodied decisions that were inherently committed to the DOC's discretion because the issue was clearly internal to the operation of a prison and had little public impact. *See Orozco v. Department of Corrections*, 83 A.3d 1161 (Pa. Cmwlth. 2014) (addressing the confiscation of items upon transfer from an out of state prison); *Bundy v. Beard*, 924 A.2d 723, 728 (Pa. Cmwlth. 2007) (addressing the confiscation of inmate mail); and *Weaver v. Department of Corrections*, 829 A.2d 750, 752 (Pa. Cmwlth. 2003) (addressing the removal of artwork from an inmate's cell).

Our Supreme Court has "recognized a category of agency decisions that are inherently committed to the agency's sound discretion and that cannot reasonably be subjected to the normal public participation process." *Small*, 722 A.2d at 669 (internal quotation marks omitted). These include, *inter alia*, "reasonable rules of internal prison management to ensure public safety and prison security." *Id.* The test used by the Supreme Court in *Small* as to whether these decisions are committed to agency discretion is whether the measure had more than an "incidental effect on the general public" so that "it is reasonable to conclude that the Legislature did not intend the measure to be subjected to the normal public participation process." *Id.* at 670 (Internal quotation marks omitted.)

Contrary to DOC's arguments, the DOC's policies concerning inmate dress codes or inmate mail are distinguishable from the Commonwealth's procedure with regard to carrying out the death penalty. Issues of dress and inmate mail are internal to the operation of the prison, with an "incidental effect on the

17

general public . . . ." *See Small*, 722 A.2d at 670. Conversely, the General Assembly has specifically enacted legislation addressing execution procedures and so we cannot say that the legislature intended prison policies regarding execution "not to be subjected to the normal public participation process." (Footnote omitted.) *Id.* at 670.

Accordingly, Petitioners have sufficiently pled a cause of action in the first portion of Claim II and the DOC's second PO is overruled and DOC shall file an answer to Claim II of the petition for review.

## C. Whether The Second Portion Of Claim II Of The Petition Fails To State A Claim Upon Which Relief May Be Granted?

Petitioners argue in the second portion of Claim II that the Protocol is "unreasonable" because it conflicts with the Federal Drug and Controlled Substances Acts and the Pharmacy Act. For example, Petitioners contend that the Protocol permits the DOC to procure the drugs through interstate commerce in violation of FDCA provisions and without a valid medical prescription. These claims appear to raise issues of fact that cannot be resolved by POs.

Accordingly, the second portion of the DOC's PO to Claim II is overruled and DOC must answer the Petition for Review.

## D. The DOC's PO Asserting Lack of Jurisdiction.

The DOC next contends that under the justiciability doctrine, the matter is not ripe for review because not all Petitioners have active death warrants signed by the Governor and those Petitioners under active warrants have had their

executions judicially stayed.[12]  However, the DOC fails to take into account that the Petitioners have all been sentenced to death by a court of this Commonwealth and each Petitioner remains incarcerated on death-row.[13]

The justiciability doctrine of ripeness addresses the appropriate time for judicial intervention.  *Town of McCandless v. McCandless Police Officers Association*, 901 A.2d 991, 1002 (Pa. 2006).  The Supreme Court has focused its ripeness jurisprudence on the principle "that the courts should not give answers to academic questions or render advisory opinions or make decisions based on assertions as to hypothetical events that might occur in the future."  *Philadelphia Entertainment & Development Partners, L.P. v. City of Philadelphia*, 937 A.2d 385, 392 (Pa. 2007).

This Court considers Petitioners' allegations that the drugs listed in the Protocol will be used to execute Petitioners as more than "rank speculation" because the Protocol was adopted by the DOC and has been in effect since August 28, 2012.

Accordingly, this Court has jurisdiction and this PO is overruled.[14]

---

[12] Pursuant to Section 4302(a) of the Code, 61 Pa. C.S. § 4302(a), once an execution warrant is signed by the Governor the execution must occur within 60 days unless a reprieve or judicial stay is granted.

[13] *See* Petition ¶¶ 14-18 at 4-5.

[14] The DOC also argues that this Court lacks jurisdiction to determine compliance with various state and federal laws because those laws are enforced, in the first instance, by the relevant state and federal agencies.  However, the Petitioners are not asking this Court to enforce compliance with various state and federal laws.  Therefore, the DOC's contention that this Court lacks jurisdiction to do so is irrelevant.

19

E. The DOC's POs Asserting Lack of Standing.

The DOC contends that the Petitioners lack standing because there is nothing in the Petition that demonstrates any of the Petitioners are "actually facing the administration of lethal injection, which in terms of the drugs it uses, does not comport with the state statute." The DOC's Brief at 22. The DOC also argues that Petitioners lack standing to pursue the various federal and state claims asserted because none of the statutes allow for a private cause of action. Finally, the DOC contends that Petitioners lack standing to assert that the Protocol violates the professional ethical standards of both nurses and paramedics.

*1. Whether Petitioners have standing to challenge the Protocol?*

"In Pennsylvania, the doctrine of standing at issue in this matter is a prudential, judicially created principle designed to winnow out litigants who have no direct interest in a judicial matter." *Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014). "The core concept" of standing is that a person who "is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge." *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 280 (Pa. 1975). An aggrieved party is one who can establish a "direct and immediate interest in the outcome of the litigation." *Fumo v. City of Philadelphia*, 972 A.2d 487, 496 (Pa. 2009).

> A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.

20

*Donahue*, 98 A.3d at 1229.

As argued with regard to Claim I, the DOC maintains that no Petitioner is actually facing the administration of lethal injection by the methods detailed in the Protocol because the imposition of their sentences have been delayed by either a judicial stay, reprieve, or because the Petitioner is not under an active execution warrant. Again, each Petitioner has been sentenced to death and currently resides on death row. Accordingly, each Petitioner has a direct interest in the execution process and drugs utilized as described by the Protocol.

The DOC also argues that Petitioners lack standing to challenge whether the Protocol was promulgated in violation of the Documents Law, Review Act, or Attorneys Act or otherwise conflicts with state or federal law. To the extent Petitioners are sufficiently aggrieved by the contents of the Protocol to confer standing to challenge the legality of the Protocol, Petitioners would also have standing to challenge whether it was promulgated in the manner prescribed by law.

The DOC's preliminary objection that the Petitioners lack standing to challenge the Protocol is overruled.

*2. Whether Petitioners have standing to challenge whether the Protocol violates the professional ethical standards of paramedics and nurses?*

A petitioner only has standing if he is adversely affected in any way by the matter he seeks to challenge. *William Penn*, 346 A.2d at 280. A review of the record reveals that Petitioners have not supplied facts or allegations

21

demonstrating they are in any way personally aggrieved by nurses and paramedics carrying out their roles on LITs in violation of their respective ethical obligations. Further, Petitioners did not reference the specific ethical standard to which they are referring and chose to not supply arguments in response to the DOC's POs in this regard.

The DOC's PO as it relates to this portion of Claim II addressing whether Petitioners have standing to challenge whether the Protocol violates the professional ethical standards of paramedics and nurses is sustained.

_____
BERNARD L. McGINLEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terrance Williams; Richard        :
Laird; Robert Wharton; Hubert     :
Michael, Michael E. Ballard,      :
individually and on behalf of     :
all others similarly situated,    :
                   Petitioners    :
                                   :
          v.                    :
                                   :
Commonwealth of Pennsylvania      :
Department of Corrections,         :   No. 353 M.D. 2014
            Respondent    :

# **O R D E R**

AND NOW, this 15th day of October, 2015, the Department of Corrections' Preliminary Objections are overruled in part and sustained in part. The Preliminary Objection in the nature of a demurrer is overruled. The Preliminary Objection with regard to jurisdiction is overruled. The Preliminary Objection with regard to whether the Petitioners have standing to challenge the Protocol is overruled. The Preliminary Objection with regard to standing to assert claims related to the ethical standards of nurses and paramedics is sustained.

The Department of Corrections is directed to file an answer within thirty days of the entry of this Order.

                                      _____
                                      BERNARD L. McGINLEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terrance Williams; Richard     :
Laird; Robert Wharton; Hubert     :
Michael, Michael E. Ballard,     :
individually and on behalf of     :
all others similarly situated,     :
                  Petitioners     :
     :
               v.     :  No. 353 M.D. 2014
     :  Argued: March 11, 2015
     :
Commonwealth of Pennsylvania     :
Department of Corrections,     :
              Respondent     :


BEFORE:  HONORABLE DAN PELLEGRINI, President Judge
              HONORABLE BERNARD L. McGINLEY, Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE MARY HANNAH LEAVITT, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge


*OPINION NOT REPORTED*

**CONCURRING OPINION**
**BY JUDGE BROBSON**          **FILED: October 15, 2015**


I join in most of the majority opinion. I write separately to note my concurrence with the majority's conclusion that Claim 1 of the Amended Petition, challenging the death penalty protocol (Protocol) of the Pennsylvania Department of Corrections (DOC) as inconsistent with 61 Pa. C.S. § 4304(a)(1), should withstand DOC's demurrer. This section provides:

> The *death penalty shall be inflicted* by injecting the convict with a continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with chemical paralytic agents approved by

the department until death is pronounced by the coroner. The coroner shall issue the death certificate.

(Emphasis added.) Unlike the majority, I do not believe this section can or should be read as precluding DOC from administering drugs not listed in the statute during execution, so long as those drugs serve some lawful purpose other than hastening death.

It is undisputed that the Protocol provides for the administration of a three-drug cocktail in the following order: (1) pentobarbital *or* sodium thiopental, (2) pancuronium bromide, and (3) potassium chloride. With respect to the first step in the Protocol, Petitioners allege that, unlike sodium thiopental, pentobarbital is *not* an ultrashort-acting barbiturate. Neither of the drugs in step two or three of the Protocol is an ultrashort-acting barbiturate. Accordingly, to the extent the Protocol allows DOC to substitute pentobarbital for the statutorily-required ultrashort-acting barbiturate, the Protocol would appear to be contrary to the will of the General Assembly, as expressed in 61 Pa. C.S. § 4304(a)(1). Also, Petitioners allege that potassium chloride is neither an ultrashort-acting barbiturate *nor* a chemical paralytic agent. Accordingly, to the extent DOC includes potassium chloride in the Protocol to hasten death and not for some other lawful purpose, its inclusion in the cocktail would also appear to violate the will of the General Assembly. Accordingly, while I concur with the majority's decision to overrule DOC's preliminary objection in the nature of a demurrer to Claim 1 in the Amended Petition, I would only allow Petitioners to pursue the above challenges to the DOC Protocol as part of Claim 1.

_____
P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Terrance Williams; Richard Laird;          :
Robert Wharton; Hubert Michael,            :
Michael E. Ballard, individually and       :
on behalf of all others similarly          :
situated,                                  :
                    Petitioners            :
                                           :     No.  353 M.D. 2014
          v.                               :
                                           :     Argued:  March 11, 2015
Commonwealth of Pennsylvania               :
Department of Corrections,                 :
                    Respondent             :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE BERNARD L. McGINLEY, Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MARY HANNAH LEAVITT, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge


*OPINION NOT REPORTED*

CONCURRING OPINION
BY JUDGE McCULLOUGH                          FILED:  October 15, 2015


          I join in the Majority opinion but write separately to make two
observations.

          The first relates to the assertions by several inmates (Petitioners) that
the death penalty protocol (Protocol) of the Department of Corrections (the
Department) violates section 4304(a)(1) of the Prisons and Parole Code (Code), 61
Pa.C.S. §4304(a)(1).  In pertinent part, section 4304(a)(1) of the Code states that

lethal injection shall consist of "an ultrashort-acting barbiturate in combination with chemical paralytic agents approved by the [D]epartment…." 61 Pa.C.S. §4304(a)(1). Petitioners aver that pentobarbital is not an "ultrashort-acting barbiturate" and that potassium chloride is not a "paralytic agent."[1] For purposes of demurrer, this Court must accept Petitioners' allegations as true. *See Bell v. Township of Spring Brook*, 30 A.3d 554, 557 n.7 (Pa. Cmwlth. 2011).

I believe that our General Assembly is in a better position than the courts to determine whether an arguably borderline drug fits (or should fit) within the statutory definition. *Seebold v. Prison Health Services, Inc.*, 57 A.3d 1232, 1245 & n.19 (Pa. 2012). Unlike this Court, the General Assembly has at its disposal objective fact-finding tools, including the ability to conduct comprehensive investigations and policy hearings. *See id.* Given that the death penalty is still legally permissible in Pennsylvania, there is necessarily an overwhelming public interest in ensuring that it is only imposed in strict accordance with the law. *See Commonwealth v. McKenna*, 383 A.2d 174, 180-81 (Pa. 1978). Therefore, I submit that the issue as to whether a particular drug should be used in the lethal injection process should be determined by the legislature, and I would urge our General Assembly to revise section 4304(a)(1) and provide a detailed and explicit manner for determining which drugs may properly be used in a lethal injection.[2]

---

[1] According to the Protocol, the sequence of administered drugs is as follows: (1) pentobarbital *or* thiopental; (2) pancuronlum bromide; and (3) potassium chloride. (Protocol, Section 3(c)(1)-(9), at 4-25—4-27.)

[2] I note that the Majority has determined that Petitioners have stated a viable claim that the Protocol is invalid for failing to following the requirements of this Commonwealth's laws with respect to promulgating regulations.

I am also troubled by Petitioners' allegation that licensed registered nurses participate as members of the lethal injection team (LIT) and perform venipuncture and administer anesthesia intravenously absent a medical doctor's order, in violation of 49 Pa. Code §21.12(1).[3] The Department does not dispute that a registered nurse performs these functions during the lethal injection process, but argues that the regulation does not apply because a nurse is not engaged in the practice of professional nursing. I agree with the Majority that Petitioners lack standing to challenge or otherwise pursue a claim under 49 Pa. Code §21.12(1).

Nonetheless, Petitioners raise significant concerns, the merits of which should be assessed by the State Board of Nursing (Board), and specifically whether registered nurses participating as part of the LIT may be violating the duties imposed by the Board. The Board also should consider whether the Protocol's requirement that the identity of the members of the LIT, including registered nurses, "will remain confidential," (Protocol, Section 4(B)(2)(c), at 4-3), creates an anonymity that could potentially cause inter-agency conflict and make it difficult for the Board to exercise its regulatory and enforcement powers. Accordingly, I would recommend that the Board either issue an advisory opinion or clarify its regulations, *see* section 2.1 of the Professional Nursing Law, Act of

---

[3] This section states:

§ 21.12. Venipuncture; intravenous fluids.

Performing of venipuncture and administering and withdrawing intravenous fluids are functions regulated by this section, and these functions may not be performed unless:
(1) The procedure has been ordered in writing for the patient by a licensed doctor of the healing arts.

49 Pa. Code §21.12(1).

May 22, 1951, P.L. 317, *as amended*, added by the Act of July 3, 1974, P.L. 432, 63 P.S. §212.1, so that registered nurses know whether they are complying with their professional duties or whether they could be subject to disciplinary action.  At the very least, I would suggest that the Board investigate the matter.

With these observations being stated, I join the Majority opinion.


_____
PATRICIA A. McCULLOUGH, Judge


Judge Leavitt joins.